UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

RHONDA L. DENNEY,                          )
Social Security No. XXX-XX-5405,           )
                                           )
                    Plaintiff,             )
                                           )
          v.                               )          3:14-cv-94-RLY-WGH
                                           )
CAROLYN W. COLVIN,                         )
Acting Commissioner of Social              )
Security,                                  )
                                           )
                    Defendant.             )

**REPORT AND RECOMMENDATION ON
APPROPRIATE DISPOSITION OF THE ACTION**

This action is before me, William G. Hussmann, Jr., United States

Magistrate Judge, pursuant to Chief Judge Young's order. (Filing No. 20.)

Plaintiff Rhonda Denney seeks judicial review of the Social Security

Administration's final decision, which deemed her able to work and therefore

ineligible for Supplemental Security Income. The matter is fully briefed. (Filing

No. 12; Filing No. 18; Filing No. 19.) Being duly advised, I find reversible errors

in the Administrative Law Judge's opinion and therefore recommend that the

Court **REMAND** this action.

## I.    Background

Denney is 48 years old and has a high school education.  ([Filing No. 10-2 at ECF p. 39](#).)  From 1996 until 1999, Denney performed office work managing an apartment complex.  (*See* *id.* [at ECF pp. 40–42](#); [Filing No. 10-7 at ECF p. 7](#).) From 2000 until 2005, she performed office work (primarily from her home) for her late husband's painting company.  (*See* [Filing No. 10-2 at ECF pp. 42–43](#); [Filing No. 10-7 at ECF p. 7](#).)  She has not worked since he passed away in 2005.  ([Filing No. 10-7 at ECF p. 6](#).)

In 2010, Denney applied for Supplemental Security Income, claiming that a variety of physical and mental impairments rendered her disabled by January 1, 2007.  (*See* [Filing No. 10-6 at ECF p. 2](#).)  In May of 2012, an Administrative Law Judge found Denney disabled because her impairments satisfied Listing 12.04 (affective disorders).  (*See* [Filing No. 10-3 at ECF pp. 4–13](#).)  Thirteen months later, the Appeals Council vacated the ALJ's opinion and remanded Denney's claim.  (*See* *id.* [at ECF pp. 40–44](#).)  On rehearing, a different ALJ found that Denney was not disabled.  (*See* [Filing No. 10-2 at ECF pp. 18–27](#).)

On judicial review, Denney contends that the second ALJ erred by disregarding important evidence of her mental impairments.  I will elaborate on that evidence below as I address her arguments.

### A. Denney's Burden of Proof and the ALJ's Five-Step Inquiry

In order to qualify for benefits, Denney must establish that she suffered from a disability as defined by the Social Security regulations.  A disability is

an "inability to do any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905(a). To establish a disability, a claimant must present medical evidence of an impairment resulting "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 416.908.

An ALJ must perform a sequential, five-step inquiry to determine whether a claimant is disabled:

(1) Was the claimant unemployed at the time of the hearing?

(2) Does the claimant suffer from a severe impairment or a severe combination of impairments?

(3) Are any of the claimant's impairments—individually or combined—so severe that the Social Security regulations have listed them as necessarily precluding the claimant from engaging in substantial gainful activity?

(4) Does the claimant lack residual functional capacity (RFC) to perform his past relevant work?

(5) Does the claimant lack RFC to perform any other work existing in significant numbers in the national economy?

See 20 C.F.R. § 416.920(a)(4).

The claimant is disabled only if the ALJ answers "yes" to all five questions. See *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). An answer

of "no" to any question ends the inquiry immediately and precludes the claimant from eligibility for benefits. *Id.* The claimant bears the burden of proof at Steps One through Four. *Id.* If the claimant succeeds, the Commissioner bears the burden at Step Five of proving that the claimant is not disabled. *Id.*

**B. The ALJ's Findings**

At Step One, the ALJ found that Denney had not engaged in substantial gainful activity since December 2, 2010. (Filing No. 10-2 at ECF p. 20.) At Step Two, the ALJ found that Denney was severely impaired by degenerative disc disease, degenerative joint disease in both knees, bipolar disorder, and panic disorder. (*Id.*)

At Step Three, the ALJ found that none of Denney's impairments—individually or combined—met or medically equaled the severity of a listed impairment. (*Id.* at ECF p. 21.) The ALJ explained that she gave specific attention to Listings 1.02(A) (major dysfunction of her knees), 1.04 (disorders of the spine), 12.04 (affective disorders), and 12.06 (anxiety related disorders). (*Id.* at ECF pp. 21–24 (applying 20 C.F.R. § 404, Subp't P, App'x 1).) The ALJ specifically found that Denney's impairments satisfied neither the "B" nor "C" criteria of Listings 12.04 and 12.06. (*See id.* at ECF pp. 22–23.) The ALJ did not address the "A" criteria for either listing.

Before proceeding to Step Four, the ALJ found that Denney's RFC would allow her to perform "medium work" (*see* 20 C.F.R. § 416.967(c)) with the following exceptions:

- Denney can only understand, remember, and carry out simple instructions.

- Denney can only make judgments commensurate with the functions of unskilled work.

- Denney can respond appropriately to brief supervision and interaction with coworkers in a work setting requiring no more than incidental interaction with the public.

- Denney can deal with changes in a routine work setting.

(*See* Filing No. 10-2 at ECF p. 24.)

In reaching this conclusion, the ALJ generally discounted Denney's testimony that her panic disorder and bipolar depression made it difficult for her to leave her home or concentrate. (*See id.* at ECF p. 25.) Instead, the ALJ credited treatment notes from Denney's treating psychiatrists, Drs. Lawrence Katz and John Wuertz, consistently indicating that Denney could concentrate and think logically and insightfully. (*See id.*) The ALJ also found that Denney's "history of babysitting multiple grandchildren demonstrates her ability to focus, concentrate, and multitask contrary to her allegations." (*Id.*)

Given those limitations, the ALJ found at Step Four that Denney could not work full-time at either of her previous, relevant jobs. (*Id.* at ECF p. 26.) At Step Five, though, the ALJ accepted a vocational expert's testimony that Denney's RFC would allow her to perform jobs like hospital cleaner, industrial cleaner, and machine feeder. (*Id.* at ECF p. 27.)

## II. Standard of Review

The Court must affirm the ALJ's decision unless it lacks the support of substantial evidence or rests upon a legal error. *E.g., Nelms v. Astrue*, 553

F.3d 1093, 1097 (7th Cir. 2009); 42 U.S.C. § 405(g). The ALJ—not the Court—has discretion to weigh the evidence, resolve material conflicts, make independent factual findings, and decide questions of credibility. *Richardson v. Perales*, 402 U.S. 389, 399–400 (1971). Accordingly, the Court may not re-evaluate facts, reweigh evidence, or substitute its judgment for the ALJ's. *See Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).

Even where the ALJ has based his decision on a legal error, the Court may not remand the action if the error was harmless. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). The harmless error standard does not allow the ALJ's decision to stand just because it is otherwise supported by substantial evidence. *E.g.*, *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). Substantial-evidence review ensures that the Administration has fulfilled its statutory duty to "articulate reasoned grounds of decision." *Id.* In contrast, review for legal errors "ensure[s] that the first-line tribunal is not making serious mistakes or omissions." *Walters v. Astrue*, 444 Fed. App'x 913, 919 (7th Cir. 2011) (non-precedential order) (citing *Spiva*, 628 F.3d at 353). Therefore, an error is harmless only if the Court determines "with great confidence" that remand would be pointless because no reasonable trier of fact could reach a conclusion different from the ALJ's. *McKinzey*, 641 F.3d at 892; *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

## III. Analysis

Denney purports that the ALJ erred by failing to give proper attention to important, contradictory evidence when determining at Step Three that her

impairments did not satisfy a listing and when determining at Step Five that she retained sufficient ability to work. For the following reasons, I agree and recommend that the Court remand this action to the Commissioner.

### A. The ALJ erred by failing to address evidence that contradicted his conclusion at Step Three.

Denney first argues that the ALJ erred at Step Three by ignoring evidence contrary to his conclusion that her mental impairments neither met nor medically equaled Listing 12.04 (affective disorders) or 12.06 (anxiety related disorders). (*See* Filing No. 12 at ECF pp. 4–15.)

Listings 12.04 and 12.06 follow a similar structure. *See* 20 C.F.R. § 404, Subp't P, App'x 1, §§ 12.04, 12.06. Each presents three sets of criteria ("A," "B," and "C"), and a claimant succeeds by demonstrating that her impairments satisfy the A criteria plus either the B or C criteria. Because Denney has not criticized the ALJ's analysis of the C criteria, I confine my review to the A and B criteria for each listing.

To satisfy Listing 12.04(A), a claimant must demonstrate that her impairments constitute a "[m]edically documented persistence, either continuous or intermittent, of" at least one of three conditions:

- "Depressive syndrome characterized by at least four" of nine specified symptoms;

- "Manic syndrome characterized by at least three" of eight specified symptoms; or

- "Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)".

Similarly, to satisfy Listing 12.06(A), a claimant must demonstrate that her

impairments are supported by "[m]edically documented findings of" either:

- "Generalized persistent anxiety accompanied by three of four" specified symptoms;

- "A persistent irrational fear of a specific object, activity, or situation";

- "Recurrent severe panic attacks manifested by a sudden unpredictable onset of" specified symptoms "occurring on the average of at least once a week";

- "Recurrent obsessions or compulsions which are a source of marked distress"; or

- "Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress . . . ."

Although the ALJ explicitly stated that he considered Listings 12.04 and 12.06,

his opinion did not address the A criteria of either listing.  (*See* Filing No. 10-2

at ECF pp. 22–24.)

The B criteria for Listings 12.04 and 12.06 are identical.  They are

satisfied if the claimant's impairments result "in at least two of the following:"

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

The ALJ found that Denney's impairments mildly restricted her activities of

daily living; moderately limited her maintenance of social functioning and

concentration, persistence, and pace; and produced no extended episodes of

decompensation.  (*See id.* at ECF pp. 22–23.)

## 1. I infer that the ALJ found that Denney's impairments satisfied the A criteria.

The Commissioner submits that Denney cannot achieve remand based on a Step Three error because she has not argued in this Court that her impairments satisfied the A criteria for either listing. (*See* Filing No. 18 at ECF p. 6.) But I find Denney's failure to argue the A criteria nullified by the ALJ's failure to address the A criteria in his opinion.

The ALJ's silence permits one of two inferences: Either the ALJ found that Denney's impairments satisfied the A criteria, or he found that Denney's impairments failed to satisfy the A criteria. If the former is true, I must proceed to assess the ALJ's evaluation of the B criteria. If the latter is true, the ALJ fell woefully short of his duty to build a logical bridge between the evidence and his conclusion—indeed, he built no bridge at all—and remand would be appropriate on that basis. *See, e.g.*, *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).

Because I find that the ALJ erred in assessing the B criteria, the distinction ultimately is unimportant. Because the ALJ discussed the B and C criteria for each listing, I assume that the ALJ found that Denney's impairments satisfied the A criteria. I therefore note that, on remand, the ALJ should include the A criteria in his Step Three analysis.

## 2. The ALJ erred in his assessment of the B criteria.

"An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596

F.3d 419, 425 (7th Cir. 2010). When the ALJ fails to address evidence favoring the claimant, a reviewing court cannot verify that the ALJ considered all the relevant evidence, understand his reasoning, or measure the substantiality of the evidence supporting his conclusion. *Zurawski v. Halter*, 245 F.3d 881, 888–89 (7th Cir. 2001). Therefore, "[a]lthough a written evaluation of each piece of evidence or testimony is not required . . . neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (citation omitted).

The Seventh Circuit specifically has admonished ALJs to evaluate all the evidence when considering factors like those presented in the B criteria. An ALJ must not limit his attention to the activities a claimant performs; he also must consider the strain and assistance with which the claimant performs them.[1] This is particularly true when the ALJ construes the fact that the claimant cares for young children as evidence of ability to work. *See Gentle v. Barnhart*, 430 F.3d 865, 867–68 (7th Cir. 2005).

Evaluating the entirety of the evidence is especially important where the claimant is impaired by bipolar disorder. The Seventh Circuit has observed

---

[1] *E.g.*, *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (finding error in ALJ's failure to acknowledge that claimant performed simple activities with great struggle); *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) ("The ALJ ignored Craft's qualifications as to *how* he carried out those activities . . . ."); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (finding error in ALJ's failure to consider that claimant was assisted by others in performing her daily activities). I acknowledge that these passages refer to ALJs' flawed analyses of claimants' credibility, but they apply the same criteria found in these listings. Moreover, I am not aware of any authority suggesting that the ALJ's duties of thoroughness and objectivity fluctuate from one phase of the sequential inquiry to the next.

that bipolar disorder disposes claimants—even those who maintain appropriate treatment—to experience "better days and worse days." *Bauer v. Astrue*, 532 F.3d 606, 608–609 (7th Cir. 2008). Therefore, ALJs must consider the frequency with which claimants experience "worse days." *See id.* at 609. In the context of bipolar disorder, worse days may not allow for productive employment, and a person who experiences worse days regularly may not realistically be able to work eight hours per day, five days per week, week after week. *Id.*

### a. The ALJ neglected evidence directly contradicting his findings concerning Denney's activities of daily living.

The ALJ found Denney's activities of daily living mildly restricted, but he never explained how Denney's activities were limited. (Filing No. 10-2 at ECF p. 22.) Instead, the ALJ simply reported what Denney *can* do: She cooks and cleans for two of her children and two grandchildren, gets them dressed, and gets them to school; and she prepares meals daily—sometimes including a "full course" meal. (*Id.*)

But the ALJ omitted important evidence concerning those activities. The same function reports upon which the ALJ relied indicate that Denney's adult daughter assists her in caring for the children in the household. (*See* Filing No. 10-7 at ECF pp. 51, 64.) They further indicate that Denney typically only makes frozen meals. (*See id.* at ECF p. 65.) When she prepares something more elaborate, she loses track of what she is doing. (*See id.* at ECF p. 52.) Consequently, she prepares "full course" meals only during manic phases. (*See id.* at ECF p. 65.)

The ALJ also failed to acknowledge evidence suggesting that Denney struggles to take care of herself on a day-to-day basis. The function reports indicate that Denney sometimes struggles to eat or attend to her personal hygiene—to the extent that her adult daughter sometimes must remind her to eat or groom herself. (*Id.* at ECF pp. 51, 64–65.)[2] Similarly, Dr. Severin Wellinghoff, a consultative examiner, observed that Denney was poorly groomed during her examination. (*See* Filing No. 10-10 at ECF p. 88.)

The ALJ erred by failing to address this evidence. By finding Denney mildly limited but neglecting to speak to any limitation, the ALJ presented no chance to trace the path of his reasoning. *See* Zurawski, 245 F.3d at 888–89. Moreover, the ALJ's representations utterly fail to communicate the full truth— that Denney completed the activities the ALJ highlighted with significant limitations and assistance. *See, e.g.*, Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013); Gentle 430 F.3d at 867.

### b. The ALJ's analysis of Denney's social functioning was incomplete.

Analyzing Denney's social functioning, the ALJ again omitted evidence that contradicted his findings.

For example, the ALJ noted that Denney "shops in stores." (Filing No. 10-2 at ECF pp. 22.) But the ALJ overlooked evidence from the function

---

[2] Denney also argues that the ALJ failed to consider one of Denney's function reports and her testimony from her hearing before the ALJ. (*See* Filing No. 12 at ECF p. 7.) Because Denney has not specified what in those records contradicted the ALJ's findings, I offer no opinion on them here but emphasize that the ALJ must consider the entire Record on remand.

reports suggesting that her bipolar symptoms complicate shopping trips. When depressed, Denney goes out only to buy necessities and rushes through her shopping because she is bothered by other customers. (Filing No. 10-7 at ECF p. 66.) When manic, she "looks at everything" and buys more than she can afford. (Id. at ECF pp. 53, 66.)

Similarly, the ALJ found that Denney "does pretty well with family members." (Filing No. 10-2 at ECF p. 22.) But several treatment notes—none of which the ALJ referenced—indicate that Denney struggles to communicate appropriately with her adult children and is irritated by her family. (See Filing No. 10-11 at ECF pp. 32, 37–38, 76.) The ALJ also noted one medical record suggesting that Denney had "a close friend," but he disregarded another record—dated only six weeks later—indicating she had no friends. (See Filing No. 10-2 at ECF p. 22; Filing No. 10-10 at ECF pp. 5, 89.)

Finally, the ALJ's conclusion that Denney "spends time with others when she is not depressed" (Filing No. 10-2 at ECF p. 22) suffers from the absence of any finding concerning how often Denney is depressed or experiences "bad days." As the ALJ noted, "on bad days she does not get out of bed unless she must." (Id.) Denney's diagnosis of bipolar disorder and even a cursory review of the medical records suggest she is depressed frequently—perhaps more often than not. It is impossible for us to know whether Denney's social interaction

supports the ALJ's finding of a moderate limitation without knowing how often Denney gets out of bed and interacts with people.[3]  *See* [Bauer, 532 F.3d at 609](#).

### c. The ALJ presented an inaccurate and incomplete assessment of Denney's ability to maintain concentration, persistence, and pace.

The ALJ found that Denney's impairments only moderately limited her ability to maintain concentration, persistence, and pace.  In support of his conclusion, the ALJ noted that Denney's treating psychiatrist, Dr. Lawrence Katz, "consistently found that the claimant's attention/concentration was good." ([Filing No. 10-2 at ECF p. 22](#).)  But the ALJ failed to reference a comprehensive examination from social worker Renae Burns finding that Denney "[h]as difficulty concentrating and thinking through problems." ([Filing No. 10-11 at ECF p. 76](#).)  The ALJ again neglected contrary evidence.  [Denton, 596 F.3d at 425](#).

Numerous problems arise from the ALJ's justification that Denney "reported she often babysat multiple grandchildren, including 100 the age of two, which require some attention and concentration." ([Filing No. 10-2 at ECF p. 23](#).)  Most obviously, no evidence indicates that Denney ever babysat 100 two-year-olds.[4]  Nor does any evidence support the Commissioner's argument

---

[3] Denney also charges that the ALJ failed to reference a portion of a treatment note describing her as angry and restless.  (*See* [Filing No. 10-10 at ECF p. 5](#) (cited in [Filing No. 12 at ECF p. 8](#)).)  Denney has not clarified how this record speaks to her social functioning, so I express no opinion on it.

[4] I assume "100" is a typographical error in place of "one."  However, if Denney does babysit 100 two-year-olds, she deserves the admiration of us all.

to this Court that Denney babysat "up to six grandchildren at one time . . . ."[5] (*See* Filing No. 18 at ECF p. 9.)  Even if the Record supported the Commissioner's assertion, the Court cannot affirm the ALJ's decision because of arguments the ALJ did not advance.  *E.g.*, *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943)).

Moreover, the medical records the ALJ cites do not clearly support the ALJ's representation.  Two merely state that Denney was "busy" with her children and grandchildren, and none indicates that she ever cared for more than one two-year-old.  (*See* Filing No. 10-11 at ECF pp. 33, 42, 47, 54.)  In fact, the ALJ cites one record indicating that Denney needed to stop babysitting because it was too taxing.  (*See* *id.* at ECF p. 47.)  The ALJ's portrayal of Denney's childcare efforts is inaccurate and incomplete.  *See* *Gentle*, 430 F.3d at 867–68.[6]

---

[5] One medical record describes a single occasion on which Denney's children invited friends to stay over such that she would have six children in her house.  (*See* Filing No. 10-11 at ECF p. 51.)  The Record gives no indication of these children's ages, whether she would be "babysitting" them, or even whether they ended up staying at Denney's house.

[6] Denney argues that the ALJ failed to address a number of other records addressing her mood but does not make clear how these records should affect findings concerning her ability to maintain concentration, persistence, and pace.  (*See* Filing No. 12 at ECF pp. 11–12.)  Denney also argues that the ALJ failed to address Dr. Wellinghoff's assessment of her short-term memory and concentration (*see* *id.* at ECF p. 12), but I find that the ALJ adequately addressed that assessment (*see* Filing No. 10-2 at ECF p. 22 ("Mental status testing performed by the consultative examiner, Dr. Wellinghoff, did reveal some problems with memory and concentration.")).

### d. The ALJ's analysis of episodes of decompensation was incomplete and rests on inaccurate assertions.

The ALJ found that Denney experienced no extended episodes of decompensation.  (Filing No. 10-2 at ECF p. 23.)  As his sole explanation, the ALJ remarked that Denney "has not required inpatient treatment for a mental impairment."  (*Id.*)

"Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20 C.F.R. § 404, Subp't P, App'x 1, § 12.00(C)(4).  Episodes are "repeated" and "extended" if the claimant experiences "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  *Id.*

Although inpatient treatments could demonstrate an episode of decompensation, so can other evidence, including

> medical records showing significant alteration in medication; documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

*Id.*

The ALJ failed to address evidence of any factor but hospitalization, and his finding concerning hospitalizations was incorrect.  In fact, Denney was hospitalized twice—for six days in the winter of 2007 and 2008 and again for

two days in September of 2010—for attempting suicide by ingesting over-the-counter drugs. (*See* Filing No. 10-9 at ECF pp. 20–54, 67–74.)

As the Commissioner notes, these two hospitalizations are too brief (and one too few) to demonstrate qualifying episodes of decompensation on their own. (*See* Filing No. 18 at ECF p. 10.) But the ALJ's blatantly incorrect statement that Denney "has not required inpatient treatment" and the narrowness of his review call into question the logic and thoroughness of his assessment. *See Zurawski*, 245 F.3d at 888–89.

Denney also directs our attention to evidence of numerous changes in her medication program, each of which the ALJ failed to address. (*See* Filing No. 12 at ECF p. 16.) The Record indicates that Denney's medications were adjusted six times between October of 2010 and February of 2011[7]; three times in June and July of 2011[8]; and four times between October of 2011 and July of 2012[9]. The notion that these frequent adjustments indicate episodes of decompensation may be bolstered by Denney's September 2010 suicide attempt and social worker Christine Utterback's February 2011 finding that Denney was experiencing "decompensation." (*See* Filing No. 10-9 at ECF pp. 20–54; Filing No. 10-10 at ECF p. 112.) And the adjustments' timing would seem to allow a finding that Denney experienced three episodes in a year.

---

[7] (*See* Filing No. 10-10 at ECF pp. 3, 7–8, 11–12, 64, 110–11, 113–14.)

[8] (*See* Filing No. 10-11 at ECF pp. 42–43, 44–45, 51–52.)

[9] (*See* Filing No. 10-11 at ECF pp. 35–36, 111–12, 118–19, 126–27.)

The ALJ's narrow focus on hospitalization, his false statement on that topic, and his disregard for other evidence that could show episodes of decompensation again raise questions as to whether he considered the entire Record. *See Zurawski,* 245 F.3d at 888–89.

### 3. Summary: The ALJ committed reversible errors at Step Three.

The ALJ erred in his Step Three assessment. The ALJ failed to address evidence that directly contradicted his conclusions concerning activities of daily living, social functioning, and concentration, persistence, and pace. *See Denton,* 596 F.3d at 425. And his analyses of the A criteria and episodes of decompensation raise serious questions about whether the ALJ considered all the criteria and all the evidence in the record. *Zurawski,* 245 F.3d at 888–89.

Moreover, the ALJ's opinion suggests his errors were not harmless. Despite overlooking voluminous evidence favoring Denney, the ALJ found her mildly limited in one category and moderately limited in two others. I therefore cannot conclude with great confidence that no reasonable ALJ would find at least two marked limitations (or one with qualifying episodes of decompensation). *See McKinzey,* 641 F.3d at 892; *Sarchet,* 78 F.3d at 309.

In reaching this conclusion, I must reject the Commissioner's argument that "the ALJ's step three finding is supported by the opinion of the state agency psychologist." (*See* Filing No. 18 at ECF p. 11.) The ALJ's Step Three analysis is devoid of any mention to the state agency psychologist, and the Court may not affirm the ALJ's opinion based on a rationale he did not present. *Steele,* 290 F.3d at 941. And, even if the Commissioner's argument could

evade the *Chenery* doctrine, it would remain unavailing: The state agency psychologist's support does not erase the ALJ's errors, nor does it persuade me that no reasonable ALJ could reach a different conclusion at Step Three if she applied the criteria and the evidence correctly. *See McKinzey*, 641 F.3d at 892.

Accordingly, I recommend that the Court remand this matter to the Commissioner with instructions to perform a Step Three analysis that properly applies all listed criteria and addresses all the evidence relevant to those criteria.

## B. The ALJ committed reversible error when evaluating Denney's RFC.

Denney next asks the Court to find error—actually, several errors—with the ALJ's RFC determination. I address each argument individually.

### 1. The ALJ did not err by failing to consider the impact of stress on her impairments.

Denney argues that the ALJ "failed to consider the impact of stress" on her impairments—implying, I perceive, that the Record indicates Denney is disabled because the increased stress associated with working would make her symptoms so severe that she could not hold a job. (*See* Filing No. 12 at ECF pp. 18–19.) In support of her argument, Denney points to 13 medical records that she purports demonstrate that Denney's bipolar and agoraphobic symptoms are aggravated by stress. (*See id.*) The Commissioner responds with a series of points (*see* Filing No. 18 at ECF pp. 13–14) that we may not credit because the ALJ did not raise them in his RFC analysis. *Steele*, 290 F.3d at 941.

I decline to find that the ALJ erred in this respect. First and foremost, Denney has not invoked any evidence or legal principle to establish that the jobs the ALJ found her capable of performing would expose her to greater stress than she experiences now. Second, it is not clear to me that Denney's citations support her argument. Only about half of Denney's references allude to stress as an exacerbating factor, and many of those references are fleeting.[10] Accordingly, the evidence Denney cites is not so conclusive or voluminous that I can conclude that the ALJ erroneously disregarded contrary evidence.

### 2. The ALJ devoted appropriate attention to evidence showing that Denney missed counseling appointments.

Denney next argues that the ALJ overlooked medical records showing that Denney missed eight counseling appointments between February of 2011 and August of 2013. (*See* Filing No. 12 at ECF pp. 19–20.) According to Denney, her frequent absences show that her agoraphobia and anxiety would not allow her to attend work consistently enough to keep a job. (*See id.* at ECF p. 19.)

In his opinion, the ALJ noted that Denney "does not like to leave home" and that "it is difficult for her to be around people." (Filing No. 10-2 at ECF p. 25.) He also cited Denney's hearing testimony that she "canceled her [counseling] appointments because she did not want to leave her house." (*Id.* at ECF pp. 25, 49.) And the ALJ inquired at the hearing whether Denney

---

[10] (*E.g.*, Filing No. 10-11 at ECF p. 116 ("Discussed possible triggers for low mood. Notes to have become overwhelmed with concern regarding issues related to children.").)

would be employable if she missed work an average of two days per month.  (*Id.* at ECF p. 65.)  The vocational expert testified she would be unemployable.  (*Id.*)

I find that the ALJ gave appropriate attention to Denney's missed counseling appointments.  He acknowledged Denney's propensity to cancel appointments and even her reasoning—that she simply does not like to leave the house.  Notably, the ALJ accepted and acknowledged that explanation even though the medical records suggested that Denney missed her appointments for different reasons.[11]  That the ALJ did not cite the medical records does not mean that he failed to consider the fact that she missed counseling appointments.

I also find that the ALJ's apparent conclusion—that Denney's missed appointments do not imply that she would miss work an average of twice per month and, therefore, be unemployable—is supported by substantial evidence.  Although Denney missed many appointments, the Record also shows that she left the house to attend many appointments.  Moreover, Denney's submissions do not indicate that she ever missed as many as two appointments in one month.  Accordingly, the ALJ could reasonably conclude that Denney would able to overcome her agoraphobic anxiety to attend work often enough to keep a job.  I cannot assign error to that conclusion without impermissibly reweighing the evidence.  *See Butera*, 173 F.3d at 1055.

---

[11] (*See, e.g.*, Filing No. 10-11 at ECF pp. 94 (confused about date of appointment), 100 (car would not start), 109 (hospitalized with pneumonia).)

### 3. The ALJ did not fulfill his duty to evaluate all the medical opinions in the Record.

Denney next argues that the ALJ erred in weighing the medical opinions in the Record. The ALJ only specifically evaluated two sets of medical opinions. The ALJ discounted a series of Global Assessment of Functioning (GAF) scores issued by Drs. Katz and Wuertz, and I will address that analysis in the next segment of this Report. The ALJ also described the conclusions of Dr. Kari Kennedy, a state agency psychological consultant, and deemed that they were "credible and consistent with the evidence of record." (*See* Filing No. 10-2 at ECF pp. 25–26.) Denney asserts that the ALJ erred by failing to assign weight to the opinions of Drs. Katz and Wuertz, her treating psychiatrists, and to a GAF score issued by Dr. Wellinghoff. (*See* Filing No. 12 at ECF pp. 20–21.)

An ALJ must evaluate every medical opinion he receives. 20 C.F.R. § 416.927(c). "Medical opinions are statements . . . that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). As a reflection of a clinician's judgment of a patient's overall level of functioning, a GAF score is a medical opinion. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. text revision 2000) (*DSM-IV-TR*).

An ALJ ordinarily should assign greater weight to an examining source's opinion than he assigns to a non-examining source's opinion. 20 C.F.R. §

416.927(c)(1).  Moreover, an ALJ must grant a treating source's opinion "controlling weight" or explain why it deserved less weight considering:

- the length, nature, and extent of the treatment relationship;

- the extent to which the source supports her opinion with explanations;

- the opinion's consistency with the record as a whole;

- whether the source has rendered an opinion in her area of specialty; and

- other factors, such as the source's familiarity with disability proceedings and the other evidence in the record.

20 C.F.R. § 416.927(c)(2)–(6).

The ALJ erred by failing to assess Dr. Wellinghoff's opinion as reflected in the GAF score (*see* Filing No. 10-10 at ECF p. 89).  To the extent that score contradicts the ALJ's RFC determination, it is not sufficient—as the Commissioner argues (*see* Filing No. 18 at ECF p. 15)—that the ALJ addressed other portions of Dr. Wellinghoff's report elsewhere in his opinion.  Nor does it matter—for the reasons I explain below—that the ALJ addressed similar scores from Drs. Katz and Wuertz.

In reaching this conclusion, I must reject the Commissioner's argument that the ALJ was not required to base his RFC determination on any particular medical source's opinion.  (*Id.* at ECF p. 13.)  In fact, this is precisely the source of the ALJ's error:  Despite acknowledging his codified obligation to consider and weigh every medical opinion in the record (*see* Filing No. 10-2 at ECF p. 24), the ALJ disregarded every opinion but Dr. Kennedy's.

To the extent the Record contains other medical opinions, the ALJ erred by failing to evaluate them. Our analysis of this issue cannot proceed further because Denney has not specified which opinions from Drs. Katz and Wuertz should have been credited. On remand, the ALJ should evaluate all medical opinions in the record and differentiate between them according to the criteria set forth in 20 C.F.R. § 416.927.

### 4. The ALJ erred in discounting GAF scores from Drs. Katz and Wuertz.

Denney argues that the ALJ erred by wrongly discounting a series of GAF scores asserted by Drs. Katz and Wuertz. The ALJ noted that Denney's treating psychiatrists "both consistently gave the claimant . . . scores of 48." (Filing No. 10-2 at ECF p. 26.) Indeed, Drs. Katz and Wuertz found 31 times between September of 2010 and April of 2013 that Denney's present GAF score was 48 and that her highest score in the last year was 49.[12]

The ALJ found that those GAF scores "do not represent an accurate assessment of the clamant [sic] status." (Id.) The ALJ explained:

> The record does not show the claimant to have symptoms such as suicidal ideation, severe obsessional rituals, frequent shoplifting, or the equivalent. In fact the mental status evaluations performed by Dr. Katz and Dr. Wuertz indicate the claimant was doing relatively well. For example, Dr. Wuertz's conclusions that the claimant had appropriate thought content and logical thought processes (as indicated

---

[12] (See Filing No. 10-10 at ECF pp. 3–4, 7–8, 11–12, 14–16, 17–18, 64–65, 70, 110–11, 113–14, 117–18; Filing No. 10-11 at ECF pp. 30–31, 33–34, 35–36, 40–41, 42–43, 44–45, 47–48, 51–52, 54–55, 83–84, 87–88, 89–91, 95–96, 98–99, 101–102, 107–108, 111–12, 113–14, 118–19, 123–24, 126–27.) I observe that the ALJ's cites only 13 of these 31 scores. (See Filing No. 10-2 at ECF p. 26.)

above) demonstrate that the claimant functions at a much better level than the GAF score of 48 indicates.

(*Id.*)

Clinicians use GAF to communicate a patient's overall level of functioning through a single number on a scale from 0–100. *DSM-IV-TR* at 32. A clinician determines a patient's level of overall functioning by considering the severity of his symptoms and his level of psychological, social, and occupational functioning. *Id.* The clinician assigns a figure to each, and the patient's GAF score is the lower of the two figures. *Id.* at 32–33.

The GAF scale is divided into ten-point ranges. *Id.* at 34. A clinician rates a patient with a specific number indicating functional level within the operative range. *Id.* So a score of 48 suggests a comparatively high level of overall functioning within the 41–50 range. A score between 41 and 50 indicates that the patient is experiencing "[s]erious symptoms," "serious impairment in social, occupational, or school functioning," or both. *Id.* Examples of serious symptoms include "suicidal ideation, severe obsessional rituals, [and] frequent shoplifting." *Id.* Examples of serious functional impairments would include an inability to keep friends or a job. *Id.*

At the outset, I note (as has the Commissioner) that the ALJ was not obligated to rely on *any* of Denney's GAF scores. *E.g.*, *Denton, 596 F.3d at 425*, *cited in* Filing No. 18 at ECF pp. 15–16. Although useful for clinicians planning treatments, GAF scores are less valuable to administrative reviewers determining whether a claimant is disabled. *Id.* The GAF reflects a clinician's judgment—not a clinically tested measurement. *DSM-IV-TR* at 32. Moreover,

because a GAF score rates two variables with a single number, a reviewer cannot know whether it reflects the clinician's opinion of the claimant's functional level, the severity of her symptoms, or both. *Denton*, 596 F.3d at 425. In fact, the American Psychological Association recently discontinued its endorsement of the GAF, citing "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013) (*DSM-5*).

But I cannot accept the ALJ's assessment of these GAF scores based on a rationale the ALJ did not advance. *Steele*, 290 F.3d at 941. The ALJ offered only one rationale for his treatment of the GAF scores—that the evidence did not support them—and the Court may affirm his analysis only if it flows logically from the evidence. *Scott*, 647 F.3d at 740.

On that standard, I find that the ALJ erred in analyzing the GAF scores. First, the ALJ's explanation refers only to Denney's symptoms and does not at all address her functionality. Because a GAF score represents the lower of the two, Denney's psychiatrists could properly have scored her at 48 even if her symptoms were not serious. In this sense, the ALJ's conclusion does not logically flow from the evidence because the conclusion reflects a misunderstanding of the evidence.

Second, to the extent the ALJ assessed Denney's functionality, he did so only by noting evidence that she displayed "appropriate thought content and logical thought processes . . . ." (Filing No. 10-2 at ECF p. 26.) But the GAF considers Denney's "social, occupational, or school functioning." *DSM-IV-TR* at

34.  A logical thought process would represent at most one of many elements of that broad range of functioning, but the ALJ found at Step Three that Denney experienced numerous functional limitations.  (*See id.* at ECF pp. 22–23.)  The ALJ incorporated none of those limitations here.

Finally, the ALJ plainly misstated the facts.  Contrary to the ALJ's assertion that Denney had not ideated suicide, Denney *attempted* suicide during the period when Drs. Katz and Wuertz rated her at 48.  (*See* Filing No. 10-9 at ECF pp. 20–54.)

Although the ALJ was free to discount the weight of GAF scores as evidence of disability, his reasons for doing so reflect inadequate attention to the GAF technique and the evidence.  Accordingly, I cannot trace the path of the ALJ's reasoning, and I find that he must reassess the GAF scores on remand.  *See Zurawski,* 245 F.3d at 888–89.

### 5. Denney's remaining arguments are unavailing.

Denney presents several other arguments that fail because they are either undeveloped or unsupported.  *See Clarrett v. Roberts,* 657 F.3d 664, 674 (7th Cir. 2011) ("undeveloped arguments are considered waived").

Denney's argument that the ALJ "substituted his own medical judgment for those of Ms. Denney's treating psychiatrists" fails because it is undeveloped. (*See* Filing No. 12 at ECF p. 17.)  I cannot understand from the preceding sentences which of the ALJ's assertions Denney is attacking or which of the psychiatrists' opinions contradicted them.

I also dismiss as undeveloped Denney's argument that the ALJ "failed to realize that the psychiatrists were reporting their observation regarding these matters and did not perform cognitive testing." (*See id.* at ECF p. 18.) This argument would seem to detract from Denney's general argument (addressed above in Part III(B)(3) of this Report) that the ALJ should have given more weight to the treating psychiatrists' opinions.

Denney recounts some of Dr. Wellinghoff's findings, but she fails to specify how the ALJ erred in treating those findings. (*See id.* at ECF p. 18.) I therefore find no basis for ascribing error based on those findings and reject this argument as undeveloped.

Denney argues that the ALJ failed to address Denney's testimony that she "has racing thoughts that never stop" when evaluating her RFC. (*See id.* at ECF p. 20.) But Denney does not clarify how the ALJ should have accommodated racing thoughts in formulating her RFC. Accordingly, I find this argument undeveloped.

Finally, Denney argues that the ALJ failed to explain how "her supposed babysitting negated her problems with leaving home." (*See id.*) I find this argument misguided, as the ALJ cited babysitting as evidence of ability to concentrate—not as evidence undermining Denney's claims of agoraphobia. (*See* Filing No. 10-2 at ECF p. 25 ("the claimant's history of babysitting multiple grandchildren demonstrates her ability to focus, concentrate, and multitask").) I therefore reject this argument as unsupported.

## IV.   Conclusion

For the foregoing reasons, I recommend that the Court **REMAND** the ALJ's decision.[13]  Any objections to this Report and Recommendation must be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1).  Failure to file timely objections within 14 days after service will constitute waiver of subsequent review absent a showing of good cause for such failure.

**SO RECOMMENDED** the 30th day of March, 2015.

_____
WILLIAM G. HUSSMANN, JR.
Magistrate Judge

**Served electronically on all ECF-registered counsel of record.**

---

[13] Recommending that the Court remand a Social Security action is difficult because the standard of review calls judges to extend the benefit of the doubt to ALJs' conclusions.  Here, the ALJ simplified that decision considerably.  In the second paragraph of his opinion, the ALJ acknowledged that the Appeals Council assigned him Denney's case with instructions to provide "specific findings and appropriate rationale for each of the functional areas described in 20 C.F.R. § 1920a(c)."  (Filing No. 10-2 at ECF p. 18.)  That regulation itself directs the ALJ to "consider multiple issues and *all relevant evidence*" in assessing the criteria addressed in Part III(A)(2) of this Report.  20 C.F.R. § 920a(c)(1)–(3) (emphasis added).  Therefore, the ALJ had unusually direct instructions from the Appeals Council to perform a thorough inquiry, but his opinion does not reflect that requisite thoroughness.